Good morning everybody. Good morning Judge Rovner who we have on the phone. Good morning. We're here today for oral argument. We are going to begin with case number one, Arwa Chiropractic v. Med-Care Diabetic. First for the Good morning. I'm Jonathan Piper for the appellant Arwa Chiropractic. This is a junk fax case under the Telephone Consumer Protection Act. We're appealing from two orders. One was granting the defendant's motion for summary judgment and denying our cross motion. The second was vacating a default judgment as to the corporation. And there's essentially three issues which I'll address in this order, whether the faxes were advertisements, whether Dr. Silverman may be liable as an officer, and whether the default judgment should have been vacated. Good morning Judge Rovner. Good morning. I am having a problem trying to understand how Silverman has standing to defend the district court's judgment in favor of Med-Care. I know that you've made a rather undeveloped argument in a footnote on page 40, footnote 10, that you believe that he has standing because the creditors of Med-Care may come back or may come after him. Well, the corporation has filed an assignment for benefit of creditors in Florida, and they are looking at fraudulent conveyance actions against the two principles of the company. So it's possible that Med-Care may someday have assets which would come from Dr. Silverman. I don't know that that gives him standing to appeal in a case where he's defaulted, where the corporation has defaulted. So are you conceding that he has no standing? Well, we're not Dr. Silverman or Med-Care. We're the plaintiff, and we're not conceding that. Are you contesting his standing? I'm sure he could have filed, they could have had somebody come in and file an amicus brief or something like that. So, you know, if the court wants to what he has to say, I don't have a problem with that. But initially, the district court wasn't going to let them file anything on his behalf, and then they went ahead and did it. And that was... What I'm trying to get at here is it is your view that he does not have standing? Correct. Okay. All right. Mr. Piper, one additional question with respect to Med-Care. Med-Care filed for bankruptcy at some point during the proceedings below. Is that correct? Not exactly. They filed an assignment for the benefit of creditors. So all the assets are now in the hands of essentially a trustee, but it's not a federal bankruptcy. It's a state court proceeding. So they never officially filed for bankruptcy, which would have kicked in the automatic stay. Correct. Okay. And the state under which that proceeding is proceeding is Florida. Okay. So I'll go back to the advertising issue. Under the TCPA, an advertisement is something that presents the availability of goods or services. The trial court acknowledged that these faxes did that. Not only do they say that their nebulizers and medications are available, but they tell the doctor to do various things to place an order. It's the doctor that's placing the order. The trial court incorrectly found that the patient had already negotiated a transaction, and this was just a rubber stamp. But in fact, the fax tells the doctor that we must obtain a signed order from the physician. You need to make a diagnosis. You need to tell us how many refills, what frequency the medication should be taken in. None of that had been negotiated. And the evidence in the form of internal procedures, Dr. Silverman's congressional testimony and internal documents established that that was Medicare's procedure and Medicare's procedure was, even though they go to the patient to line them up first, then they need to get an order from the doctor, and then they go back to the patient. Are you disputing that the patient and Medicare, before the fax was sent, had agreed to the purchase of the nebulizer subject to the signature of the physician who had ordered it in the first place? Right. There's evidence that would make that a disputed issue. That would make it a disputed? That makes it a disputed issue. What's the evidence? Again, I understand your argument that it's not finalized until the doctor signs on it, but what's the evidence that makes it disputed in the first instance that they had agreed to the purchase of it? Well, one, Dr. Silverman testified to Congress, and they really have to say this for Medicare purposes, there's no order until the doctor initiates it. The doctor makes the order. That's what a prescription is. And there's an important document. I wish I'd put it in the appendix. It's in the record at 133-2, page 156. It's Exhibit 32 to the Getz deposition. They quoted the first part, which is about how they call the patient first, but then you go down and paragraph four says, after receiving a prescription from the treating physician, Medicare contacts the patient to go over the prescription, discuss the medication, answer questions or concerns, and during this call, the patient is presented with yet another opportunity to decline Medicare services. So it's only... And what is that document that you're... That is their overview of their prescription fulfillment process. And I'm sorry I didn't put it in the appendix because it addresses the question you asked. You know, our law has argued that Medicare, by not answering the complaint, admitted the allegation that the faxes were indeed advertisements. But isn't that a mixed question of law and facts? In other words, certainly a party can admit that the fax was sent and concede the content of the fax. Those are factual matters. But can a party, simply by not answering, admit that those fax meet the legal standard for its advertisements? Well, it's generally considered that the default admits the allegations of the complaint. And incidentally, before defaulting, Medicare had made a motion to dismiss on the basis that on their face these were not advertisements. And that motion was denied. For example, the trial court found it significant that the faxes say that Medicare is a contracted bidder and so forth, that they sort of tout their status, which according to Medicare, they do that so that doctors will not think they're being defrauded when they get these faxes. The court initially denied Medicare's motion to dismiss on that basis, and they defaulted later when they filed the assignment for benefit of creditors. Is there any evidence, or are you arguing, that the faxes were intended to induce the doctors to make future purchases here? Well, they do provide for repeat prescriptions. So in that sense, it's not just the one time only. For the individual patient who's the subject of the fax? Correct. But you're not arguing that the purpose of this fax was to get the doctor to use and purchase additional nebulizers or products from Medicare, are you? Well, it's certainly theoretically possible that a doctor would say, hey, patient, I just got this information about this great company, but that's not the business model of Medicare. Your bottom line is that it doesn't, or you tell me if this is your bottom line, is that it doesn't matter that the patient is the ultimate consumer because the sale cannot be transacted without first selling the doctor on the company's products, right? That's correct. And we point to the two Third Circuit mouthy decisions from earlier this year that said exactly that in the context of prescribed medications, that the most powerful paradigmatic example of where a fax to person A for goods to be sold to person B would be an advertisement is saying, doctor, you should prescribe our medications to your patient because the doctor has so much influence over the patient's decision that essentially they're selling the products to the patient through the doctor's recommendation and prescription. But in the Third Circuit cases, wasn't the company attempting to encourage the chiropractor to prescribe a particular drug as opposed to here where the client and Medicare had already had that discussion and agreed to that? That seems to be a significant difference. Well, I don't see the distinction, actually. It could be that most companies would send a fax to the doctor saying, we've got great nebulizers, prescribe them for your patients, plural. But here they go to the patient first and say, your patient wants you to prescribe this for them. Now, they only get 50% return rate from the data that's in the record. But it's still marketing to the doctor to say, prescribe this to your patient. The fact that it's targeted marketing. I open up Google every day. It says, here's what you were shopping for on Amazon yesterday. We've got a great deal. It just dropped the price. Well, that's still advertising, even though I'd already been looking the day before. Targeted marketing is common with social media, and that's essentially what this is. Before you get too far into towards your rebuttal time, I want to talk a little bit about that second issue, the Silverman liability. As I understand it, the Physician's Health Source Inc. versus AS Medication case decided by Judge Connolly here in the Northern District is on appeal, correct? I believe that's correct. And as I understand, it's being briefed. And that issue of the personal liability under the TCPA, is that issue in that case? Is that correct? I'm not 100% sure on that. Perhaps you want to touch on that area of your argument. Well, I do. This whole business is based on faxing these prescription requests. It was set up that way by Dr. Silverman. He knew what was going on. He testified about it in May 2013 in Congress, which was just three months before this set of faxes went out. So it's well established you don't have to push the button on the fax machine to be liable. You just have to either participate or control. Participation here would be the general fact that he set up the business to do this. And the knowledge and control would be he's the head of the company. He knew what they were doing. I mean, I don't want to get too exaggerated, but if you set up a laundromat for purposes of money laundering, you don't have to be the one collecting the coins to have some liability for the wrongdoing. Where, in your opinion, or is your argument, is so that line should be drawn? At some point, the corporate form takes over, right? Where it should be drawn is when the finder of fact makes a determination, not at the summary judgment stage, would be my answer. Good answer. What is the evidence in the record that Silverman was personally involved in the decision to send the faxes? Because what it's sounding like is that Arwa is primarily relying on evidence that Silverman knew the company was sending faxes, but is knowledge alone enough to pierce the corporate veil and hold an officer liable for the acts of the company? Well, it's participation or control under the common law standard. And in addition to having set all this up, Dr. Silverman could have unset it up. It's not just that he knew about it, but he created a business where the whole business model, 95% of their transactions, was based on this faxing procedure. But is there any evidence that he was personally involved in this at all? Well, only that he set the company up and knew how the company worked. So we're not claiming that he designed the prescription request form. We're not claiming that he put the lists together. But other cases that have held corporate officers liable, they didn't necessarily design the fax or even approve it. They knew that fax advertising was being done. They ordered it. You know, if, for example, the Paldo case, the guy never actually authorized the faxing. But clearly, Dr. Silverman authorized 95% of the business of his company. I'd like to also address the default, even though there is the standing issue. The law is clear that what happened here was wrong. The fact that Dr. Silverman got summary judgment on two independent bases, one of which had no bearing on Medicare itself, does not require the vacation of the default judgment. The inconsistency that's described in cases like Uranium and Dundee is not this kind of legal argument inconsistency. What they would be worried about is, say we got a judgment against Dr. Silverman, but the court said, you know, I don't find that half of your fax logs are admissible, so I'm cutting your requested judgment in half. Then the default judgment as to Medicare would have to be cut in half. They don't want two defendants to be jointly and severally liable for different amounts of money based on the fact that one defaulted. But that's damages. That's not liability. Particularly here where one of the issues on liability was whether the corporate officer participated or controlled, and that defense does not apply as to the corporation. What about if the court finds that the fax was not an advertisement, then how can the company be held liable for the fax being an advertisement? Well, one, because they defaulted, and two, because there's another basis for liability here. So, for example, suppose we filed a new case against Medicare separately. There would not be issue preclusion because the advertisement issue was not essential to this judgment. There's not claim preclusion. In other words, it's got to be essential to the determination. And here, Dr. Silverman's summary judgment would have been won even without the advertising issue. Are you sure of the rest of your time? Yeah, unless somebody's got a question they want me to address now. Nope. Thank you. We'll now move to Mr. Schultz on behalf of the appellee. Good morning, Your Honor. If you may please the court. My name is Jim Schultz, and I'm here on behalf of Dr. Silverman. I think the one thing we could agree upon is generally the three issues that are involved in this case. But I think there's also a few things that we could deal with in the front end as far as what this case is not about. What is clear and what the record makes abundantly clear is that there was no attempt in this case to try to sell the plaintiff, Arwa Chiropractic, anything. There was no advertisement directed to the recipient of this fax. There's also no evidence, and there's no argument being made here that the fax that was sent to Dr. Arwa was to induce any future sales. That question was directly asked. Counsel said no, except maybe to the extent that there might be refill prescriptions. It's important to understand, though, Medicare's business. They are a durable medical equipment supplier. They don't supply medications. Medications are provided by pharmacies. So to the extent that there would be future sales of pharmaceutical goods, that's not coming from Medicare. So the refills would not be coming from Medicare. They get the nebulizer, the durable equipment, that's it. Medicare supplies the nebulizer. You're correct, Your Honor. And then Medicare is done with respect to that patient? To the extent that the nebulizer... Unless they lose it or... Yeah, replaced or anything like that. But yes, essentially, the transaction is a one-time deal for a durable medical equipment. On page 12 of your brief, you argue that, quote, the sale of the nebulizer was already complete when Medicare sent the faxes. Can Medicare lawfully sell nebulizers to patients without prescription? Can Medicare insist on payment for the nebulizer if the physician refuses to sign off? What I'm getting at is, how can you characterize a sale as complete when the doctor must examine the patient, determine a diagnosis, and then determine an appropriate treatment before signing off on this supposedly done deal? Judge Robner, there was a completed sale here. There's, I think, a distinction to be made between a commercial transaction and a medical diagnosis. And here, the patient, or actually the patient's mother, reached out to Medicare because of her son's breathing condition. He was known to have the breathing condition already by his actual treating physician, who ended up not being the Dr. Arworth that's involved in this case. Regardless, though, the patient and Medicare had reached an agreement on the equipment that was to be supplied, the price for that equipment, and how that equipment was to be delivered. That's the essential terms of the sale. The fact that we needed to, on the back end, get authorization from the doctor to complete the sale doesn't alter that fact. And this case then falls more in line with the 11th Circuit's decision in Florence, where what we're dealing with is an order fulfillment process. At the time that Medicare is sending this fax to Dr. Arworth, there's already agreement on all the essential terms of the purchase agreement between the patient and Medicare. And the fact that we need to get the approval of the doctor for Medicare purposes doesn't change that, especially when you consider the fact that Medicare was accredited by the Center for Medicare and Medicaid Services, and that this process for how they were going to be obtaining consent from the doctors to authorize the final purchase was approved. So they're accredited, they're reviewed, and the federal government is endorsing, basically, the process that they're using here to sell the product. Well, then how do we deal with Silverman's letter to Senator McCaskill? He makes clear, and again, I'm going to quote, that a consumer-slash-patient cannot initiate a request until a physician has authorized the need for medical supplies with a prescription. What I need to figure out is how is that consistent with Silverman's insistence in this appeal that the fact is nothing more than the conclusion of an almost-completed transaction initiated by the patient. If the doctor must initiate the transaction, then the fact serves as an advertisement to the doctor to authorize a sale to the patient. I mean, I think, Judge Romney, your question presumes that this is an advertisement just because it's asking the doctor to approve it. That's not the definition or the analysis for what is or is not an advertisement. An advertisement needs to be something that's promoting the commercial availability of the product. Here, it's not commercially available. The product is not being sold to Dr. Arwa or the recipient of the fax. So what we have here instead is the parties have already agreed upon the sale. It's akin to if you go into an auto dealership and you purchase a car and you agree to all the essential terms, but then you've got to get your credit report run at the end to make sure you're going to qualify for the financing. It's just the order of fulfillment at that process is that, okay, are you going to meet that final threshold to close this deal? But the deal terms have already been reached. And most importantly, there was no indication in the fax or in any communication that would have been had with the treating doctor of any change. There wouldn't be alternate equipment. There wouldn't be any negotiations. There wouldn't be any changes to the price. The good, the price, the delivery had already been established, just like the car has already been established. And so the fact that we just need a doctor to give a final sign-off becomes of no merit or no consequence because the deal is already struck. There are two parties to this deal. And it's the patient and it's Medicare. And the fact that we need to get doctor approval for this to seek reimbursement through Medicare doesn't change that. And again, it comes down to what would this otherwise be advertising to Dr. Arwa? And here, are we advertising the availability of any good or service to the doctor that the doctor could purchase? And the answer there is unequivocally no. There's no contested facts in this case on that issue that at no point in time would Dr. Arwa be asked to spend money or to purchase anything. Nor is Dr. Arwa being asked to talk to his patient about the good. He's not being asked. I know, but Medicare is marketing its services directly to patients, even though patients may not obtain Medicare's products without a doctor's prescription. I think, Your Honor, Judge Romer, you hit on the essential point. And it's what Dr. Silverman also told Congress. Their marketing, their advertisement is to the patients. It's not to the doctors. They specifically don't market and advertise to the doctor. So if we circle back to, was this an advertisement to Dr. Arwa? The answer is no. And that's based on not only the content of the facts and the reason why the facts were sent, but it also goes back to the business model for Medicare, which again, is to directly market and advertise their products to the patients. And if the patient was- And the patients who respond to Medicare's ads are then asked to provide information about their physician. You know, and then they report to contact the physician on behalf of the physician, and they're asking the physician to sign off on prescriptions. So, and a diagnosis code. I don't understand how any doctor could ethically fill this fact out without examining the patient, making a diagnosis, and determining whether the products are necessary. And you said that it wasn't Dr. Arwa who had made the diagnosis. It was someone else, correct? Right. So what happened in this case, Your Honor, is the patient who was attempting to purchase the nebulizer, her son was being treated by a different Dr. Arwa. So this fact was sent to the wrong Dr. Arwa. And the fact of the matter is, though, that had this fact gone to the correct doctor, that doctor was the treating physician for the patient. This doctor would have been aware of this patient's medical conditions. This doctor would have already made the diagnoses of the patient's condition and would have been aware that the patient either had a breathing problem or whatever else that would necessitate the need for the nebulizer. So the ethical issues for the doctor here would, in normal circumstances, have been addressed by the fact that Medicare's business is to communicate with the doctor that's treating the patient. Had the doctor who was treating the patient here made a recommendation that he get a nebulizer? We don't know that, Your Honor. We spent a lot of time and effort trying to get the mother's name, Ms. Stevens, to appear for a deposition. It was scheduled several times, and our office was in communication with her that she would appear, but then she never showed up. So the exact nature of her son's medical condition, what the third Dr. Arwa may or may not have diagnosed, we don't know at this point. Because it's not disputed that the mother reached out to Medicare in the first instance. Correct. We know that Ms. Stevens accessed Medicare through an online portal, and that's how this whole transaction started, with Ms. Stevens reaching out to Medicare. Is there any evidence in the record regarding who came up with Medicare's business plan that relied on sending faxes to customers' doctors? There is no... Was Silverman involved in the development of that business plan? There is no evidence of that in the record, Your Honor. What we know in the record is that Dr. Silverman was a co-founder of the company. But I think it's important to note that as we sit here today, Dr. Silverman was never deposed in this case. So what Dr. Silverman's actual role here, and his personal participation in creating the company as a co-founder, and implementing any sort of faxing programs, is unsettled. And it's the plaintiff, the appellant here, who has the obligation, if we're going to try to assign personal liability to Dr. Silverman, to have developed that record. And we don't have it. Well, all we know is what Dr. Silverman testified to in an affidavit in support of the summary judgment motion, and that Judge Lee references, which is that Dr. Silverman was the president of the company, he was focused on the big picture business development aspects of it, and he deferred or delegated to the underlings below him for the actual implementation of that. If you read plaintiff's complaint, they make some pretty specific allegations about what Dr. Silverman did, his specific participation in designing and choosing to send these faxes, and where the fax were to go. But that evidence never was developed. There was never any evidence in the district court as to what Dr. Silverman may have done. So all we have is Dr. Silverman's unrebutted testimony about how he didn't have any involvement in sending these faxes, about how he didn't have any involvement in choosing whether or not these faxes would go out, how he didn't have any involvement in coordinating with any medical, or I'm sorry, any fax broadcasting companies to send out these faxes. The reality is that there is actually not one piece of evidence in the record as to what Dr. Silverman did regarding this fax. And that's important. It's not just what the company did on a holistic level. We see some inflammatory language in the appellant's brief about Medicare's practices and this scheme, about how they send out millions and millions of faxes. This case isn't about that. This case is about the faxes that were sent to Dr. Arwa and similarly situated people regarding the nebulizer. Indulge us, Mr. Schultz, on some procedural questions about what happened in the district court. At some juncture, Medicare's counsel withdraws, correct? Correct. And that counsel, though it's the same attorney or same attorneys, they continue to represent Medicare, or continue to represent Dr. Silverman, correct? Correct. And then in a notification of docket entry, Judge Lee says, if Medicare is going to be represented, they've got to have a lawyer that's going to appear by, I think, December 8th of 17, correct? Correct. And that never does end up happening, right? Correct. Then the judgment that Judge Lee enters, and I'm on docket 164, is in favor of Dr. Silverman and Medicare against Arwa, correct? Correct. And this is a judgment that's generated by the district court, correct? Yes. Was there a request made by counsel for Silverman that that include Medicare? Elucidate for us what happened in the district court with regard to that. Yes. So it was my office that, well, we substituted very early in the case for a different lawyer, but early on in the case, we represented both Medicare and Dr. Silverman, okay? When Medicare ran into some financial difficulties, they were teetering on the edge of bankruptcy, they ended up falling into this assignment for benefit of creditors action in Florida, and the company closed up shop. The company is no longer a going concern. They don't exist anymore. Dr. Silverman essentially told us that the company was unable to pay any sort of legal bills, and that all its energies was going into winding up the company in this ABC proceeding in Florida. Originally, we were intending to withdraw from the representation of both Dr. Silverman and Medicare because of that. Dr. Silverman then actually retained us just individual capacity to represent him and allow Medicare to be defaulted because the company doesn't exist anymore. And to the extent that there's a claim or judgment against Medicare, that could be sought in the ABC. In the process of seeking summary judgment, and in the process of seeking to have Judge Lee's default against Medicare vacated, Dr. Silverman did request that the district court vacate and enter judgment in favor of Medicare. And the reason for that is simple. Based upon representations that were made by plaintiff's counsel, it was our understanding that the intention was to try to secure a judgment against Medicare, and then to go into the assignment for benefit of creditors and to seek to recover that either from the assets of the defunct company or the individual officers, which would have then included Dr. Silverman. So what we thought, and what it appeared to be, was a situation where the plaintiffs were attempting to go through the back door to get to Dr. Silverman, what they couldn't do through the front door. And so Dr. Silverman specifically did ask the district court to enter judgment in favor of Medicare and vacate the default. Thank you very much. But let me try and clarify something. No one is representing Medicare on appeal, correct? That is correct, Judge Roebner. So if you don't represent Medicare on appeal, how do you have standing to defend the court's judgment in favor of Medicare? Well, because the judgment, at least for two of the three issues, Your Honor, specifically also deal with Dr. Silverman. The district court correctly concluded that this was not a faxed advertisement. It wasn't trying to induce anybody to purchase anything. The district court also found that Dr. Silverman was not personally liable for that because, as we've talked about, there was no record evidence that Dr. Silverman personally participated in the sending of this, and the fax was undeniably not sent on his behalf. So those two issues are certainly the issues that apply with equal force to Dr. Silverman and Medicare. To the extent that we get to the third issue about the court's decision to vacate the default judgment, it's important to keep in mind, first off, that a different standard applies. The standard that we apply when deciding whether or not that vacating of that default was proper is an abuse of discretion. So we have to ask, did Judge Lee abuse his discretion in just choosing to vacate the default, and why did he do it? And Judge Lee's transcript, the transcript of his oral ruling on this, illuminates quite well why it's not an abuse of discretion, and it's quite actually the fundamentally fair result. Because this case, whether it be against Medicare or Dr. Silverman, arises from the same exact conduct. And certainly in law and in equity, there is this concept that there shouldn't be different judgments for the exact same conduct. And so here we have a situation where, as a matter of law, on a disputed motion, the district court has found that this was not a fax advertisement and enters a judgment against the plaintiff, awarding zero damages. It defies logic and creates an absurd result if we have that exact same facsimile found to be an advertisement and entering a judgment of $32 million plus to a class, when the court knows that it wasn't an advertisement. So although on a default, we're required to assume the truth of the allegations and that the facts are true, the court also does have a gatekeeping function here. And that's why there's default hearings. That's why the district court would have had a hearing on damages. That's why several decisions out of this Seventh Circuit have all cautioned against this idea of inconsistent verdicts. And that's what we're trying to guard against here. Whether it be Medicare or Dr. Silverman asking for it, the harm to be avoided is that inconsistent verdict. Unless there's no other questions, I don't think I have really anything else more to say, except... Okay. Judge Roper, any further questions? Nope. Thank you very much. Thank you, Mr. Schultz. Mr. Piper, we'll go back to you for rebuttal. Well, I'd like to point out that two statements counsel made are contrary to the testimony that's in the record from Dr. Silverman. First, he said that... Do you mean his affidavit? I'm referring to his congressional testimony, which is ECF 133-4. So counsel said that there was agreement on price before the fax was sent. But there's no evidence in this record what the price was for this nebulizer. And in fact, that came up in the congressional testimony and what Dr. Silverman told Senator McCaskill is that we sell these at little or no cost to the patient. Well, that sounds cheap, but it doesn't tell us how cheap. We don't know what little or no cost means. There's no evidence that that was discussed with the mother in this case. There's also no evidence about any treating physician having made any diagnosis. There's no evidence whatsoever even as to who the treating physician was. So it was not another Dr. Arwa? Well, it was apparently a Dr. Hamid in Central Illinois. That's all that the mother told the person on the phone. And then they looked up some database. And instead of finding a Dr. Hamid in Peoria, they found a Dr. Hamid in Rockford and sent him six faxes, even though he called back several times to say stop sending these faxes. I don't know who this patient is. There is evidence that, well, it's a reasonable inference drawing the inferences in our favor that Dr. Silverman helped set up 95% of the business practices of his companies. But what there's direct evidence is is that three months before these faxes were sent, he was in the hot seat before a congressional committee defending this fax practice. So before these faxes were sent, he was the guy before Congress saying what we're doing is okay. We send these faxes. It's not until the physician gives us the fax back that we would send anything to the patient. So that may not be whether he set it up, but he sure knew about it and defended it in Congress three months before the faxes at issue here. Thank you, Mr. Piper. Okay, thank you, judges.